IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANGELA ST. CLAIR,              )      CASE NO. 4:21-CV-01327

               Plaintiff,        )

                 v.             )      MAGISTRATE JUDGE
                                )      AMANDA M. KNAPP

COMMISSIONER OF SOCIAL      )
SECURITY ADMINISTRATION,      )      **MEMORANDUM OPINION**
                                )      **AND ORDER**

               Defendant.      )

Plaintiff Angela St. Clair ("Plaintiff" or "Ms. St. Clair") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  The matter is before this Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 14.)

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

## I.  Procedural History

On October 12, 2018, Ms. St. Clair filed an application for SSI.  (Tr. 72.)  She alleged a disability onset date of January 1, 2018.  (Tr. 73.)  She alleged disability due to lupus, diabetes, hemolytic anemia, degenerative disc disease, asthma, anxiety, and depression.  (Tr. 106.)  Her application was denied at the initial level (Tr. 88) and upon reconsideration (Tr. 105), and she requested a hearing (Tr. 114-17).  On April 23, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 39-71.)

On June 10, 2020, the ALJ issued a decision finding Ms. St. Clair had not been under a disability within the meaning of the Social Security Act from October 12, 2018 through the date of the decision.  (Tr. 7-25.)  On May 11, 2021, the Appeals Council denied Ms. St. Clair's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On July 9, 2021, Ms. St. Clair filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 11.)

## II.  Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. St. Clair was born in 1979, and was 39 years old on the date the application was filed, making her a younger individual under Social Security Regulations at all relevant times.  (Tr. 19.)  She had at least a high school education, and no past relevant work.  (*Id*.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

Sundershan Garg, M.D., a specialist at the Blood & Cancer Center, Inc., saw Ms. St. Clair on January 3, 2019 on an urgent basis for severe anemia.  (Tr. 451.)  She reported she was tired, weak, and dizzy.  (*Id*.)  She also reported losing a significant amount of weight in the past few weeks and having pain in her upper abdomen.  (*Id*.)  Physical examination results were in the normal range.  (Tr. 453.)  Dr. Garg noted "she is off prednisone for 2 weeks, feels good, has lost 13 pounds," and advised her to continue with folic acid and vitamin D, follow up with her rheumatologist, and return in three months.  (*Id*.)

On January 29, 2019, Ms. St. Clair saw rheumatologist Ralph Rothenberg, M.D., for treatment of lupus and low back pain.  (Tr. 619.)  She described having biopsy proven discoid lupus that was successfully treated with steroids and medication "years ago."  (*Id*.)  She reported

that physical therapy five years prior had made her pain worse.  (*Id.*)  She also described pain in her knees for which she tried Tylenol without relief.  (*Id.*)  Dr. Rothenberg noted her anemia was in remission; however, she reported experiencing tingling in both hands over the past year, worse on the left hand, and pain in her knees.  (Tr. 619.)  Examination findings were normal except for tenderness in the lumbar spine and lower back, mildly enlarged and slightly tender thyroid, subjective decreased sensation in her left S1 dermatome, and subjective dysesthesias median nerve distribution in both hands.  (Tr. 621.)  Dr. Rothenberg assessed spondylosis with myelopathy of the lumbar region.  (Tr. 622.)  He also diagnosed polyneuropathy (unspecified), and noted she had paresthesias in her hands that could be due to cervical spondylosis, but that neuropathy needed to be excluded.  (*Id.*)  He prescribed gabapentin for pain.  (*Id.*)

On February 7, 2019, Ms. St. Clair underwent an EMG and nerve conduction study at the Mercy Health Neuroscience Institute to test for polyneuropathy in both upper extremities.  (Tr. 656-57.)  The nerve conduction studies revealed no abnormalities.  (Tr. 659.)  The electro diagnostic examination of both arms and legs revealed diffuse myotonic and myopathic potential.  (*Id.*)  These findings were consistent with a myotonic myopathy.  (*Id.*)  There were no definitive motor radiculopathies or peripheral neuropathy.  (*Id.*)  On examination, Ms. St. Clair had tenderness of the left hand but no Tinel's sign.  (*Id.*)  Neurologist Donald Tamulonis, M.D., opined that the diagnosis was likely myotonia congenita or Thomsen's disease, but "highly advised" clinical correlation.  (*Id.*)

On February 27, 2019, Ms. St. Clair returned to Dr. Rothenberg, who noted she was limping due to left leg discomfort.  (Tr. 643.)  She was taking gabapentin without side effects, but reported it was not helping and her back pain persisted.  (*Id.*)  She also continued to report problems with urinary tract infections, with frequent urination and burning despite treatment

with antibiotics.  (*Id.*)  Dr. Rothenberg reviewed the EMG studies, which showed myotonia not associated with Lupus.  (Tr. 644.)  He noted that x-rays of her cervical spine performed in February 2019 showed degenerative disc disease at L5-S1 and at C3-C4 of the cervical spine.  (Tr. 644, 652.)  Physical examination results were unchanged except for a rash on her chest.  (Tr. 645-46.)  Dr. Rothenberg restarted hydroxychloroquine to treat the flushing on her skin, increased her gabapentin, and advised that her urinary tract issues needed to be resolved before treatment for her back and neck pain could begin.  (Tr. 646.)

A March 27, 2019 x-ray of Ms. St. Clair's lumbar spine showed degenerative changes with marked disc space narrowing at L5-S1.  (Tr. 680.)  On April 12, 2019, Ms. St. Clair retuned to Dr. Rothenberg, who noted she was "still limping a bit due to left leg discomfort"; she reported the increased dose of gabapentin had helped her back pain "partially."  (Tr. 648.)  Ms. St. Clair also reported she was sleeping better but had some sedation with her morning dose of medication.  (*Id.*)  On examination, the sacroiliac and lumbar areas of her back were tender, she continued to have a rash on her chest, a mildly enlarged and slightly tender thyroid, subjective decreased sensation in her left S1 dermatome, and subjective dysesthesias median nerve distribution in both hands, with sensation "normal to light touch."  (Tr. 650-51.)  He continued her medications and advised her to return in twelve weeks.  (Tr. 651.)

Ms. St. Clair saw Dr. Tamulonis at Mercy Health Neurology for further evaluation and management of myotonia on April 3, 2019.  (Tr. 805.)  She reported muscle spasms in her arms and left flank throughout the day, but denied any weakness, tripping, or falling, and denied any neck or low back pains radiating into her limbs.  (Tr. 806.)  The neurological examination and routine laboratory data were both unremarkable, and Dr. Tamulonis indicated that she was "otherwise stable medically."  (Tr. 807-08.)  He concluded that her muscle spasms were

consistent with a myotonic disorder, prescribed baclofen to treat her cramps, and advised her to return in six months. (Tr. 808.)

On October 1, 2019, Ms. St. Clair returned to Dr. Rothenberg for treatment of lupus and low back pain. (Tr. 1031.) He noted she was on gabapentin, which was partially effective but caused a lot of sedation. (*Id.*) The baclofen she was taking for myotonic dystrophy also contributed to her sedation. (*Id.*) On examination, both sacroiliac areas were very tender, more on the lumbar spine, there was some diffuse lower back tenderness present, and she was limping a bit on her left leg because of the pain. (Tr. 1034.) Dr. Rothenberg indicated tenderness over both CVA areas might be related to kidney stones. (*Id.*) He also noted a mildly enlarged thyroid, subjective decreased sensation in her left S1 dermatome, and subjective dysesthesias median nerve distribution in both hands, with sensation "normal to light touch." (*Id.*) He continued her medications and advised her to return in twelve weeks. (*Id.*)

Ms. St. Clair returned to Dr. Tamulonis on October 2, 2019. (Tr. 823.) On examination, she retained normal muscle strength and tone, but had "a questionable slightly decreased grip release." (Tr. 824.) Other neurological examination findings remained unremarkable, including intact coordination and normal gait, but he noted she had difficulty walking on toes, heels, and tandem. (*Id.*) Because Ms. St. Clair's reported symptoms were not consistent with his clinical findings, he noted "I now question embellishment of symptoms." (Tr. 825.) Dr. Tamulonis increased her dosage of baclofen and advised her to return in six months. (*Id.*)

Ms. St. Clair returned to Dr. Rothenberg on January 2, 2020, where he again noted that her medication caused sedation. (Tr. 1036.) Examination results were unchanged, and medications were continued. (Tr. 1038.) On February 14, 2020, she saw Dr. Rothenberg and reported photosensitive rashes, arthritis, anemia, oral ulcers, Raynaud's, and low back pain. (Tr.

1039.)  Since her last visit, she complained of increased pain in her hands that radiated up into

the forearms, and that her feet felt very cold.  (*Id*.)  Dr. Rotherberg noted that he had added

Eloxatin to her gabapentin, but it had not helped.  (*Id*.)  Examination results were unchanged,

except for a rash on her left palm.  (Tr. 1042-43.)  Dr. Rotherberg requested preapproval for a

new lupus medication, Benlysta, and switched her amlodipine to nifedipine to treat Raynaud's.

(Tr. 1043.)

Ms. St. Clair saw Dr. Rothenberg via telehealth on April 15, 2020, and again complained

of increased pain in her hands radiating into her forearms.  (Tr. 1044.)  Dr. Rothenberg noted

"she has limited [range of motion] but not current numbness."  (*Id*.)  Examination results were

largely unchanged, although it is noted that he was not able to perform a full examination.  (Tr.

1045-46.)  Dr. Rothenberg noted her lupus "seems to be getting worse with increased swelling

and pain in both hands."  (Tr. 1046.)  However, he also noted her labs showed a "normal sed

rate," and ordered a shot of Kenalog.  (*Id*.)  He advised her to call in two weeks to let him know

if Kenalog was helpful, and return in eight weeks.  (Tr. 1046-47.)

## 2. Opinion Evidence

### i. Consultative Examinations

Paul Schefft, M.D., performed a consultative examination on March 27, 2019 at the

request of the State agency. (Tr. 671–80.)  She reported her back pain began three years prior,

and her neck pain began six months prior.  (Tr. 671.)  She described the following symptoms:

constant low back pain; pain that went down her left arm; headaches; tingling in her left foot,

face, arms and neck; constant pins and needles in her left foot; and joint pain in the wrist, elbows

and fingers.  (*Id*.)  Dr. Schefft observed that she walked with an antalgic gait which was not

unsteady, was stable at station, and appeared "comfortable in the supine and sitting positions."

(Tr. 673.)  He noted tenderness in her shoulder joints, normal grip strength in both hands, left hip tenderness and pain on range of motion, tenderness in both the cervical and dorsolumbar spine, and a right knee click.  (Tr. 673-74.)  She had full muscle strength and sensory modalities, but was unable to walk on her heels and toes, perform tandem gait, or squat due to her joint pain.  (Tr. 674.)  Dr. Schefft assessed dorsolumbar strain with radiculopathy, cervical neck pain, lupus, joint pain in the shoulders, left hip and right knee.  (*Id*.)  He opined that Ms. St. Clair's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least moderately impaired."  (Tr. 675.)

### ii.    Opinion of Plaintiff's Medical Provider

In a statement faxed to the State agency on January 14, 2019,[1] Dr. Garg reported that Ms. St. Clair had finished Prednisone but was taking folic acid.  (Tr. 507.)  Her anemia was in remission at the time and she was off steroids.  (*Id*.)  Dr. Garg stated Ms. St. Clair's "anemia may relapse," but opined there were "no restrictions for her to go to work at this time."  (*Id*.)

Dr. Rothenberg completed a medical source statement dated March 12, 2020, where he stated he had treated Ms. St. Clair since January 29, 2019 for lupus and lumbar spondylosis.  (Tr. 951.)  Her reported symptoms included rash, oral ulcers, Raynaud's syndrome, and arthritis.  (*Id*.)  In a checkbox form, he opined that she: could stand, walk and sit less than two hours each in an eight hour day; could lift and carry less than ten pounds on an occasional or frequent basis; needed to shift between sitting, standing and walking at will; and needed to lie down periodically during an eight-hour work day. (*Id*.)  He also opined that she would be absent from work three times per month due to her conditions.  (*Id*.)  He estimated her limitations began in 2014.  (*Id*.)

---

[1] Other pages of this opinion were apparently included in the record at Tr. 528-29, and are dated January 14, 2019.

### iii.       State Agency Reviewers

On April 10, 2019, state agency reviewing physician Leslie Green, M.D., reviewed the record and opined that Ms. St. Clair had the following physical functional limitations:

- lift twenty pounds occasionally and ten pounds frequently;

- stand/walk for about six hours in an eight-hour workday;

- sit for about six hours in an eight-hour workday;

- frequently kneel, stoop, crouch, and balance;

- occasionally crawl, or climb ramps and stairs;

- never climb ladders, ropes, or scaffolds; and

- avoid concentrated exposure to extreme temperatures, vibration, and hazards.

(Tr. 84-85.)  On June 18, 2019, state agency reviewing physician Elizabeth Das, M.D., reviewed the record and concurred with the opinion of Dr. Green, except that she limited Ms. St. Clair to occasional balancing, stooping, kneeling, and crouching.  (Tr. 100-02.)

## C.       Hearing Testimony

## 1.       Plaintiff's Testimony

At the April 23, 2020 hearing, Ms. St. Clair testified that she lives with her three children, aged nine, eighteen, and twenty.  (Tr. 46.)  On a good day, she can be on her feet for about two hours and sit for two to three hours, and usually goes in between sitting and standing throughout the day.  (Tr. 56.)  On a bad day, she does not get out of bed.  (Tr. 55-56.)  She testified that she stayed in bed about three days per week.  (Tr. 56.)  She reported a lot of recent discomfort and swelling in her hands, and that it was difficult for her to open and close them.  (Tr. 57.)  She stated her hands regularly became numb, throbbed all day long, and were so swollen that she could barely make a fist.  (*Id*.)  Gabapentin did not help, and her condition had worsened over

the past three months.  (Tr. 58.)  She took her medications at night because they caused extreme

fatigue and drowsiness.  (Tr. 48.)  She reported trouble sleeping through the night and waking up

four or five times per night in pain.  (Tr. 58.)  Because she woke so early, she napped for an hour

and a half every afternoon.  (Tr. 59.)

 With regard to activities of daily living, Ms. St. Clair testified that she was in the home

most of the time because she could not many things unassisted.  (Tr. 60.)  On a good day, she

could cook, do laundry, or clean, but she was limited to one activity per day.  (*Id*.)  Doing four

loads of laundry and the dishes would leave her in tears, and she would be bedridden the

following day.  (Tr. 62-63.)  She testified she had not driven in at least six months because her

hands were numb, and because she was afraid due to an incident where her diabetes caused her

to pass out while driving.  (Tr. 60-61.)  Her son usually took her grocery shopping, and she used

a motorized cart.  (Tr. 64.)

 With regard to her physical impairments, Ms. St. Clair testified that she experienced

symptoms of lupus that included rashes, sores on her face and hands, severe anemia, and very

sore joints.  (Tr. 50.)  She explained that her lupus medication helped her not have "so many

outbreaks that are just like the open sores" but that it did not help with other issues like anemia.

(Tr. 50.)  She reported that her rheumatologist recommended infusions, but her insurance would

not approve that treatment until she first tried two new medications; she had been using the new

medications for a few weeks with no improvement.  (Tr. 51.)  She previously had to take steroids

for about eight months for her lupus, which caused her to develop diabetes.  (Tr. 52.)  She

testified that her lupus caused joint pain that "comes in flares," and that she was always in pain,

although some days were better than others.  (Tr. 53.)  When symptoms flared up, she treated the

pain with ice and heat therapy, hot baths, moving around, and light exercises.  (Tr. 54.)  She also

described having severe muscle spasms, and bouts of pain that knocked her out once a week, relating to the myotonia.  (Tr. 54-55.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. St. Clair's age, with a high school education, no work background, and the functional limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including cashier, sales attendant, or merchandise marker.  (Tr. 66-67.)  The VE also testified that missing more than eight days per year, being off-task 33% of the day, or needing to lie down during the day precluded competitive work.  (Tr. 68-69.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his June 15, 2020 decision, the ALJ made the following findings:[2]

1.     The claimant has not engaged in substantial gainful activity since October 12, 2018, the application date.  (Tr. 12.)

2.     The claimant has the following severe impairments: Lumbar degenerative disc disease, cervical degenerative disc disease, diabetes mellitus, obesity, Lupus, Raynaud's syndrome, anemia, neuropathy, and myotonia congenita.  (*Id.*)

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13.)

---

[2] The ALJ's findings are summarized.

4.      The claimant has the residual functional capacity to perform light work
        with the following additional limitations: She could occasionally use foot
        controls bilaterally. She could never climb ladders, ropes or scaffolds but
        could occasionally climb ramps and stairs. She could occasionally balance,
        stoop, kneel, crouch, and crawl. She could frequently handle and finger
        bilaterally. She must avoid concentrated exposure to temperature extremes
        of hot and cold. She is limited to work with no vibrating hand tools, and
        must avoid workplace hazards such as unprotected heights or exposure to
        dangerous moving machinery. (Tr. 13-14.)

5.      The claimant has no past relevant work.  (Tr. 19.)

6.      The claimant was born in 1979 and was 39 years old, defined as a younger
        individual age 18-49, on the alleged disability onset date.  (*Id*.)

7.      The claimant has at least a high school education.  (*Id*.)

8.      Transferability of job skills is not material to the determination of
        disability.  (*Id*.)

9.      Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform, including cashier, sales
        attendant, and merchandise marker.  (Tr. 19-20.)

Based on the foregoing, the ALJ determined that Ms. St. Clair had not been under a

disability, as defined in the Social Security Act, from October 12, 2018, through the date of the

decision on June 15, 2020.  (Tr. 20.)

## V.  Plaintiff's Arguments

Ms. St. Clair argues that the ALJ's finding that she can perform light work is not

supported by substantial evidence because he did not properly evaluate the opinion of her

treating rheumatologist Dr. Rothenberg.  (ECF Doc. 9, p. 1.)

## VI. Law & Analysis

**A.** **Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.  Sole Assignment of Error: Whether ALJ Properly Evaluated Treating Opinion

Ms. St. Clair asserts that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly evaluate the opinion of her rheumatologist, Dr. Rothenberg.  (ECF Doc. 9, pp. 11-12.)  Specifically, she argues that the ALJ he failed "to sufficiently articulate why Dr. Rothenberg's opinion is not supported by and consistent with the evidence." (*Id.* at p. 12.)  The Commissioner responds that the ALJ reasonably found Dr. Rothenberg's opinion to be "not persuasive" because it was inconsistent with evidence, including his own treatment notes.  (ECF Doc. 11, p. 7.)  She asserts that "a review of the record, decision, and authorities demonstrates that the ALJ's decision is supported by substantial evidence." (*Id.*)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors

listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In her sole assignment of error, Ms. St. Clair argues that the ALJ failed "to sufficiently articulate why Dr. Rothenberg's opinion is not supported by and consistent with the evidence." (ECF Doc. 9, p. 13.) The ALJ explained his analysis of Dr. Rothenberg's opinion as follows:

> Specialist Dr. Rothenberg provided an assessment in March 2020, based on treatment since January 2019. He noted diagnoses of Lupus and lumbar

15

spondylosis. Treatment consisted of medication. Dr. Rothenberg opined the claimant could stand/walk for less than two hours and could sit for less than two hours in a normal workday. She could lift less than 10 pounds. She would need to lie down during work, and would require a sit/stand option with no specified duration or frequency. She would be absent from work three times per month. All limitations existed since 2014. (19F) <u>This assessment is not persuasive nor supportable. Although Dr. Rothenberg is a treating specialist, his opinion is inconsistent with treatment notes.</u> His treatment notes show good response to conservative treatment, and relatively normal clinical exams with 5/5 strength, normal gait except a slight limp at some sessions, normal skin exams, and sustained remission of Lupus and anemia. Further, Dr. Rothenberg did not meet the claimant until 2019, and did not offer any basis to support such restrictions since 2014.

(Tr. 18 (emphasis added).)

More specifically, Ms. St. Clair argues: (1) "the records do not in fact show good response to treatment"; (2) objective findings in physical examinations and other medical records support Dr. Rothenberg's opinion; (3) the fact that Dr. Rothenberg estimated that her limitations existed in 2014 was not a valid basis to reject the opinion; (4) Dr. Rothenberg's specialty in rheumatology "lend[s] further credence to his medical opinion" and was not discussed by the ALJ; and (5) Ms. St. Clair has consistently reported the same symptoms and limitations to various physicians, to SSA, and in her testimony.  (ECF Doc. 9, pp. 13-14.)

Each of these arguments will be addressed in turn.

### 1. Whether Substantial Evidence Supported Finding That Dr. Rothenberg's Treatment Notes Show Good Response to Conservative Treatment

In challenging the ALJ's finding that Dr. Rothenberg's opinion was "not persuasive nor supportable" in part because it was inconsistent with Dr. Rothenberg's own treatment notes, which "show good response to conservative treatment" (Tr. 18), Ms. St. Clair argues "the records do not in fact show good response to treatment."  (ECF Doc. 9, p. 13.)  She notes, for example, that she was taking gabapentin at the time of her February 2019 rheumatology appointment "but it was not helping and her back pain persisted."  (*Id*. at p. 14.)  In April 2019, she notes that she was taking an increased does of gabapentin "which again, Dr. Rothenberg noted only minimally

16

helped her back pain." (*Id.*)  She argues that the ALJ's finding is not supported by substantial evidence because of his failure to address this evidence.  (*Id.*)

As a threshold matter, the undersigned notes the ALJ was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  He was also permitted to rely on information articulated earlier in the decision to support his persuasiveness determination, and was not required to rearticulate that information the opinion discussion.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

A review of the ALJ decision reveals that he did appropriately discuss the nature and effectiveness of Ms. St. Clair's treatment with Dr. Rothenberg.  He noted that Ms. St. Clair was not using any medication for pain when she began treatment with Dr. Rothenberg in January 2019, when she was prescribed gabapentin.  (Tr. 16 (citing Tr. 619-22).)  He observed that gabapentin was not helping when she returned to Dr. Rothenberg one month later, but that her back pain was reduced with an increased dose of gabapentin by April 2019.  (*Id.* (citing Tr. 643-46, 648-60).)  He noted that her lupus remained "quiet," her anemia was in remission, there were no significant changes from the previous examination, and there was no indication of hand swelling or rash in April 2019.  (*Id.* (citing Tr. 648-60).)  By April 2020, the ALJ observed that

17

Dr. Rothenberg noted baclofen was helping with muscle spasms but caused some drowsiness, that Ms. St. Clair's fingers lacked one cm range of motion, and she had mild tenderness in her spine and a "little bit" of a limp on the left.  (Tr. 17 (citing Tr. 960-65).)  He also noted that Dr. Rothenberg provided a Kenalog injection, with plans to add methotrexate if her condition did not improve.  (*Id.*)  These observations are consistent with Dr. Rothenberg's treatment records, and are not inconsistent with the ALJ's conclusion that Ms. St. Clair's treatment with Dr. Rothenberg was conservative, and that she showed a good response to that treatment.

The ALJ also provided the following broader articulation of his findings regarding the limited and conservative nature of Ms. St. Clair's treatment as a whole:

> These records do not support the alleged severity and frequency of symptoms. Rashes were rare, with the claimant denying skin eruptions for a three-year period at one visit. Lupus and anemia were generally in remission. The claimant denied fatigue at most visits, but muscle relaxers did cause some drowsiness. Diabetes did not cause any notable symptoms, and HbA1c was recently 6% according to the claimant. Treatment for back pain was minimal, consisting of only medication. . . . As noted above, her hands showed some subjective sensation symptoms, and were swollen with a 1cm range of motion reduction at one visit. However, there are no consistently documented manipulative limitations. Medical records do not substantiate allegations that she is bedridden for half the week. Only one episode of syncope was documented, in contrast to the frequent syncope alleged. Medical staff did not witness that episode, and a subsequent evaluation was normal. . . . Overall, the clinical exams, long periods of remission, conservative treatment and lack of documented syncopal episodes besides one self-reported event in early 2018 are not consistent with the alleged limitations and symptoms.

(Tr. 17.)  The undersigned finds that the ALJ adequately articulated his basis for concluding that Dr. Rothberg's treatment records reflected a good response to conservative treatment.  Ms. St. Clair has not shown that this finding was unsupported by substantial evidence.

### 2.    Whether Substantial Evidence Supported ALJ's Finding That Dr. Rothberg's Opinion Was Inconsistent with Treatment Notes

In addition to noting Ms. St. Clair's good response to conservative treatment, the ALJ also found Dr. Rothenberg's opinion to be "inconsistent with treatments notes" that included

"relatively normal clinical exams with 5/5 strength, normal gait except a slight limp at some sessions, normal skin exams, and sustained remission of Lupus and anemia."  (Tr. 18.)  Ms. St. Clair argues that this finding was not supported by substantial evidence because "objective findings upon numerous examination support Dr. Rothenberg's opinion."  (ECF Doc. 9, p. 13.)  She argues further that the opinion is "not inconsistent with the objective evidence including diagnostic studies, and the findings of Dr. Shefft and Dr. Tamulonis."  (*Id.* at p. 14.)

In support of this argument, Ms. St. Clair points to objective clinical findings from Dr. Rothenberg's treatment notes, including paresthesias in her hands in January 2019 and limping in February 2019 and April 2019.  (*Id.*)  A review of the ALJ decision reveals that the ALJ accurately observed that Ms. St. Clair's January 2019 examination reflected "[s]ensation in the hands was intact to light touch despite subjective reports of abnormal sensation" (Tr. 16 (citing Tr. 619-22) and that she was "limping 'a little bit' due to left leg discomfort" at her April 2019 visit (*Id.* (citing Tr. 648-60)).  Indeed, his discussion of the opinion specifically acknowledged that Ms. St. Clair had a slight limp at some sessions.  (Tr. 18.)  Thus, Ms. St. Clair has failed to demonstrate that the ALJ failed to consider these objective findings.

Ms. St. Clair also notes that the objective evidence from other sources included a March 2019 x-ray showed degenerative changes with marked disc space narrowing at L5-S1 and an EMG consistent with myotonic myopathy.  (ECF Doc. 9, p. 15 (citing Tr. 634-35, 680).)  A review of the ALJ decision reflects that the ALJ also considered these findings.  He noted that spinal imaging "showed L5-S1 and mild C3-C4 degenerative changes," with a plan to send Ms. St. Clair to physical therapy (Tr. 16 (citing Tr. 643-46)), but also noted that her treatment for back pain was conservative and "[h]er physician recommended physical therapy, but the claimant did not attend physical therapy since the alleged onset date" (*Id.* (citing Tr. 501-02)).

He also noted that EMG results "showed myotonia, resulting in a neurology referral" (Tr. 16 (citing Tr. 643-46)), and that Ms. St. Clair's follow-up with neurology resulted in a prescription for Baclofen and instructions to wear supportive shoes (*Id.* citing Tr. 697-700)).  Thus, Ms. St. Clair has failed to demonstrate that the ALJ did not consider these objective findings.

Ms. St. Clair additionally points out that neurologist Dr. Tamulonis noted spasms consistent with myotonic disorder and that Ms. St. Clair's grip was bilaterally weakened.  (ECF Doc. 9, p. 15 (citing Tr. 808, 824).)  The ALJ did acknowledge that nerve testing showed myotonic discharges with no other abnormalities, and that baclofen was prescribed for muscle spasms.  (Tr. 16 (citing Tr. 805-08).) With respect to a "weakened" grip, the ALJ did not specifically discuss Dr. Tamulonis' observations from October 2019 that Ms. St. Clair's strength was "5/5 throughout—but sudden giving way with both grip" and "I find no percussion myotonia but now questionable slightly decreased grip release."  (Tr. 824.)  However, he did accurately observe that her physical examination that day was "relatively normal with normal sensory functioning, 5/5 strength, and normal gait."  (Tr. 16 (citing Tr. 823-25).)  He also quoted the following observations from Dr. Tamulonis with respect to that day's clinical findings:

> This individual had displayed an unremarkable neurological examination. I now question embellishment of symptoms. However, her spasms remain consistent with the myotonic disorder. She likely suffers from myotonia congenita or Thomsen's disease. Baclofen will be increased per rehabilitation.

(*Id.*)  Thus, Ms. St. Clair has failed to demonstrate that the ALJ did not appropriately consider Dr. Tamulonis' clinical examination findings.

Finally, Ms. St. Clair notes that consultative examiner Dr. Shefft made clinical findings that included some 0/4 deep tendon reflexes, inability to walk on heels or toes, inability to perform tandem gait or squat due to joint pain, joint tenderness, pain with range of motion, pain on palpation, and sportive straight leg raise.  (ECF Doc. 9, p. 15.)  But the ALJ provided a

detailed account of Dr. Shefft's clinical findings that included all of these findings, and also found Dr. Shefft's findings that Ms. St. Clair would be subject to "moderate" limitations to be persuasive and supportable.  (Tr. 18 (citing Tr. 671-81).)  The ALJ concluded that the described "'moderate' limitations are consistent with a range of light work."  (Tr. 18.)  Thus, Ms. St. Clair has failed to show that the ALJ did not consider the consultative examination findings.

Ms. St. Clair argues that meaningful review of the ALJ decision cannot occur "without more of an explanation from the ALJ as to why Dr. Rothenberg's opinion is not consistent with or supported by the evidence."  (ECF Doc. 9, p. 15.)  However, as discussed above, a review of the decision reveals that the ALJ explicitly considered the same objective evidence highlighted in Ms. St. Clair's brief.  After considering that evidence, the ALJ found Ms. St. Clair's clinical examination findings to be inconsistent with the very significant physical limitations described in Dr. Rothenberg's opinion, such as an inability to sit, stand or walk for even two hours in an eight-hour workday or to lift or carry even ten pounds on an occasional basis.  The undersigned finds substantial evidence supported this finding, and that the ALJ adequately explained the basis for his conclusion that the findings were inconsistent with Dr. Rothenberg's opinion.

### 3.  Whether ALJ Erred in Discounting Estimated Timing for Limitations

In weighing Dr. Rothenberg's opinion, the ALJ noted that "Dr. Rothenberg did not meet the claimant until 2019, and did not offer any basis to support such restrictions since 2014."  (Tr. 18.)  Ms. St. Clair argues that Dr. Rothenberg's estimation that her limitations existed since 2014 is "not a valid basis to reject his opinion" because he had treated Ms. St. Clair for over a year by the time he rendered the relevant opinion, which was "long enough to have a strong foundation from which to render an opinion."  (ECF Doc. 9, p. 13.)  It is evident from a review of the ALJ decision that the ALJ did not discount Dr. Rothenberg's opinion solely because he estimated that

the same level of limitation applied for five years before he began treating Ms. St. Clair. Given that the alleged onset of disability was January 1, 2018, a full year prior to Ms. St. Clair's first treatment visit with Dr. Rothenberg, it was also wholly appropriate for the ALJ to note that Dr. Rothenberg "did not offer any basis to support such restrictions since 2014."

### 4. Whether ALJ Erred in Addressing Dr. Rothenberg's Medical Specialty

Ms. St. Clair also argues that the ALJ failed to discuss the fact that Dr. Rothenberg was a specialist in the area of rheumatology, which should have lent "further credence to his medical opinion." (ECF Doc. 9, p. 13.) First, the regulations did not require the ALJ to discuss his consideration of Dr. Rothenberg's specialization. *See* 20 C.F.R. § 404.1520c(b)(2). Second, the ALJ expressly acknowledged that "Dr. Rothenberg is a treating specialist" before finding his opinion to be "inconsistent with treatment notes." (Tr. 18.) The ALJ also provided a detailed discussion of Dr. Rothenberg's treatment records from January 2019, February 2019, April 2019, and April 2020. (Tr. 16-17.) Ms. St. Clair has therefore failed to demonstrate that the ALJ gave inadequate consideration to Dr. Rothenberg's specialty in weighing his opinion.

### 5. Whether ALJ Appropriately Considered Ms. St. Clair's Subjective Reports

As an additional basis for challenging the ALJ's persuasiveness finding, Ms. St. Clair contends that she "consistently reported the same symptoms, and resulting limitations to various physicians, to the agency and in testimony," and that her subjective reports were consistent with the opined limitations. (ECF Doc. 9, pp. 13-14.)

It is well-established that "an ALJ is not required to accept a claimant's subjective complaints." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Further, "[t]he Sixth Circuit has repeatedly upheld an ALJ's decision to discount a treating physician's opinion that appears to be based on a claimant's subjective complaints, without sufficient support from

objective medical data." *Livesay v. Comm'r of Soc. Sec.*, No. 17-CV-14214, 2019 WL 1503135,

at *6 (E.D. Mich. Feb. 1, 2019) (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th

Cir. 2004); *see also Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012); *Poe v.

Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009)), *report and recommendation

adopted*, No. 17-14214, 2019 WL 1198700 (E.D. Mich. Mar. 14, 2019); *Crofutt v. Comm'r of

Soc. Sec.*, No. 2:13-CV-706, 2015 WL 964113, at *15 (S.D. Ohio Mar. 4, 2015) (citing *Ferguson

v. Comm'r of Soc. Sec.,* 628 F.3d 269, 273-74 (6th Cir. 2010)).

Here, the ALJ provided a detailed recitation of the record evidence regarding the

subjective complaints highlighted in Ms. St. Clair's brief.  (Tr. 14-17.)  Further, as outlined in

Section VI.B.1., *supra*, the ALJ gave a detailed recitation of the specific medical evidence

supporting his conclusion that the "records do not support the alleged severity and frequency of

symptoms."  (Tr. 17.)  The ALJ additionally observed:

> The claimant testified that trying to hold any object hurts so much that she wants to
> cry. She stated that her hands get stuck either open or closed "all day long." She
> further alleged that she cannot effectively hold items. However, she admitted that
> she can perform limited cooking, washing dishes, and other chores. She testified
> that she smokes a pack of cigarettes per day, which requires her to be able to hold
> and light the cigarettes throughout the day. As noted above, her hands showed some
> subjective sensation symptoms, and were swollen with a 1cm range of motion
> reduction at one visit. However, there are no consistently documented manipulative
> limitations. . . . Although I accept testimony that there are some symptoms in the
> claimant's hands, these activities are consistent with the ability to use her hands on
> a frequent basis.

(Tr. 17.)  The ALJ also noted that Ms. St. Clair's neurologist "question[ed] embellishment of

symptoms" in October 2019.  (Tr. 17 (citing Tr. 823-25).)  The undersigned finds Ms. St. Clair

has failed to demonstrate that the ALJ did not consider her subjective complaints, or that he

lacked the support of substantial evidence in finding that the record as a whole did not support

the alleged severity and frequency of her symptoms.

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406.  Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence . . . supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Here, considering the totality of record, the Court finds the ALJ properly considered the supportability and consistency of Dr. Rothenberg's opinion and explained his decision sufficiently to allow this Court to conduct a meaningful review of his determination. The Court accordingly finds Ms. St. Clair's sole assignment of error is without merit.

## VII. Conclusion

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.

February 28, 2023

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

24